IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                         Plaintiff,<br><br>        vs.<br><br>SAMUEL P. KYDNEY,<br><br>                         Defendant. | **8:13CR165**<br><br>**MEMORANDUM OPINION** |

This memorandum supplements findings made on the record at trial on August 15, 2013.  The court sustained the defendant's motion for a judgment of acquittal on Count I of the Indictment at the close of the government's case.

I.    FACTS

In Count I of the Indictment, the government charged that:

> [O]n the Santee Sioux Indian Reservation, the defendant, SAMUEL P. KYDNEY, a Native American male, with the intent to terrorize C.J., a non-Native American male, and in reckless disregard of the risk of causing such terror, did threaten to commit a crime of violence, to wit:  assault, in that the defendant, SAMUEL P. KYDNEY, did: (1) fire a rifle numerous times in the general direction of C.J. with the rounds striking the ground approximately 120 feet to the right of where C.J. was located; (2) shouldering the rifle and pointing it directly at C.J.; and (3) watching C.J. and another person work for approximately 30 minutes while holding the rifle on his lap and occasionally pointing it at C.J. and the other person.
> In violation of Title 18, United States Code, Sections 1152, 13, 7 and Nebraska Revised Statute § 28-311.01(1)(a) & (c).

Filing No. 1, Indictment at 1.

In Count II of the Indictment, the government charged simple assault under federal law, as follows:

On or about April 2, 2013, in the District of Nebraska, on the Santee Sioux Indian Reservation, the defendant, SAMUEL P. KYDNEY, a Native American male, did assault C.J., a non-Native American male, by placing C.J. in reasonable apprehension of receiving bodily injury, in that the defendant, SAMUEL P. KYDNEY, did shoulder a rifle and point it directly at C.J. after having discharged the weapon several times.

In violation of Title 18, United States Code, Sections 1152 and 113(a)(5).

Filing No. 1, Indictment at 1.

The evidence at trial, viewed in the light favorable to the government, showed that the alleged victim, Christopher Jessen, acquired an eight-year lease on property on the Santee Sioux Reservation as the successful bidder at an auction sometime in November of 2012. The defendant, Samuel Kydney, and his mother, Grace Kydney, were the previous lessors and wished to remain tenants on the property. Jessen intended to farm the land, specifically, he intended to tear up the prairie hayfield on the property and farm it. Grace Kydney bid against Jessen at the auction.

Jessen testified he first met Sam Kydney when Kydney came to the Jessens' house to discuss his family's remaining on the property as tenants sometime in mid-December 2012. Jessen and his wife both testified it was a civil or cordial meeting. Jessen agreed to lease the house on the property to the defendant and his mother, but stipulated that he did not want animals on the property. He was concerned that livestock would get into his field and damage his crop. At that time, he estimated the Kydneys had about 30 goats, a couple of donkeys, and a horse. He later brought a lease agreement, containing a modified "no animals" provision, to the Kydneys' house for them to sign. Both the defendant and his mother signed the lease agreement.

Under the procedures in place for the acquisition of the property, Jessen was required to pay the former lessee, Grace Kydney, for improvements to the property.

2

Jessen testified that he wrote a check for $2,900 to Grace Kydney, but it was somehow lost in the mail and she never received it.  Jessen testified that he later agreed that the Kydneys could lease 14 acres and could keep some of the animals, but no goats, and in exchange, Jessen would keep the $2,900 he owed Grace Kydney.  Jessen testified that he first told the Kydneys that they could not have animals on the property in mid-December of 2012, but set a deadline of March 1, 2013.  He later extended the deadline to May 1, 2013.

He also testified that Grace Kydney told him she thought there was an Indian burial ground on the property.  An individual from an archeological society inspected the property and said he couldn't find anything.

Between the time Jessen acquired the lease and the incident that is the subject of the indictment, Jessen had spoken to the defendant several times.  First, when the defendant came to the Jessens' house to inquire about remaining on the property.  Next, when Jessen brought the lease to the Kydneys for signature, and then on the first of each month when the defendant paid the rent until the modified lease was negotiated.  He also testified that in late March of 2013, while tearing out trees on the hayfield, he saw the defendant target practicing near the Kydneys' house.  Jessen testified they engaged in small talk at that time.  He also testified that he had never seen the defendant on the farm ground without a weapon.

Jessen testified that on the day of the incident at issue, April 2, 2013, he was working the field near the Kydneys' house.  He had sent a text message to Sam Kydney the previous night, telling Kydney to check on the goats, which apparently were having babies, because Jessen had seen several baby goats on the property.  Jessen testified

3

that he did not tell the defendant to kill the goats.  On April 2, 2013, he was doing dirt work in the field and cleanup from the earlier removal of trees.  He saw the defendant walking up a hill carrying a gun.  He stated he had not seen any goats that day.  Jessen was in an enclosed tractor.  He stated that he pulled up to the defendant and asked him what he was doing.  The defendant replied that he had been told by his mother to go and kill every baby goat he could find.  He stated they talked for a while and Jessen took off in his tractor in a southeasterly direction.

He then observed the defendant running "commando-style" across the field to the fence line.  The defendant then turned and walked back.  Jessen then heard six or seven shots and saw dirt kick up 40 yards to his right.  When he looked back at the defendant, the defendant had his gun shouldered.  Jessen testified the defendant raised the gun, pointed it directly at Jessen, and lowered it.  The defendant later ran some distance and reached down and held up a bloody baby goat.  Kydney then carried the baby goat back in the direction of his house and then sat on the hood of a car.

Jessen testified the defendant's gun appeared to be an AR style semiautomatic weapon.  He stated that the proximity of the shots made him uncomfortable, "it was too close for comfort."

Jessen testified that he then went to find Roger Guenther, who was helping him with the work, and told Guenther something to the effect that Sam Kydney had been "shooting at a goat" and "kind of shooting in his general direction."   Jessen and Guenther continued to work in the area for a while.  Jessen stated that the defendant continued to hold the gun while sitting on the car.  He stated that he and Guenther

stayed about 15 minutes longer and then Jessen went home in his pickup and Guenther drove the tractor home.

On cross-examination, Jessen stated that the initial encounter with the defendant in December was civil, just talking back and forth, and neither party was angry. He testified that after the $2,900 was not delivered to Grace Kydney, he offered them more land to lease and agreed to let them keep a few animals in exchange for keeping the $2,900. He also stated that the Kydneys always paid their rent on time and it did not appear that the Kydneys had any problem with the arrangement.

Jessen testified he related the story to his wife, Michaela Jessen. She later testified, generally corroborating Mr. Jessen's testimony. Roger Guenther also testified. He stated that he heard shots and otherwise corroborated Mr. Jessen's testimony.

Federal Bureau of Investigation ("FBI") Agent Jeff Howard also testified. He stated he began his investigation after receiving information that a farmer named Chris Jessen reported that the defendant had pointed a gun at him and fired shots in his direction on the Santee Sioux Reservation. Agent Howard interviewed Chris Jessen and Roger Guenther over the phone and later executed a search warrant at the defendant's house. Agent Howard testified he conducted a five-minute interview with Jessen a few days after the incident and a fifteen-minute interview on April 22, 2013. Neither interview was recorded.

He stated that Jessen told him in the second interview that when the shots were fired, the defendant was 150 feet (50 yards) behind Jessen and 120 feet (40 yards) to his right. Agent Howard testified that Jessen specifically told him that the weapon the

defendant used was an AR15 .223 with a microdot scope.  He also stated that a .223 has a much bigger caliber bullet than a .22.  Further, he testified that Jessen did not tell him about having sent a text to Kydney the night before the incident.  Jessen provided the copies of the texts to Agent Howard on or about July 22, 2013.  Agent Howard did nothing in the way of further investigation after getting the copies of the texts.

As part of his investigation, he contacted the defendant's mother, who worked at the reservation casino, on April 19, 2013.  At Agent Howard's request, she called her son and asked him to come to the casino.  The defendant voluntarily came to the casino.  The defendant was not told what the meeting was about.

Agent Howard conducted an interview with the defendant and recorded it.  An audio-recording of those parts of the interview that relate to the charges was admitted into evidence and played for the court and the jury.  *See* Exhibit ("Ex.") 12, audio-recording; Ex. 13, transcript.  Agent Howard testified that Sam Kydney was cooperative, was not combative, and freely talked about what had happened.

In the interview, Kydney told the agent he was taking care of the goats with the gun and had no intention of shooting or threatening or scaring Mr. Jessen.  Further, the defendant told Agent Howard him that the gun he had was a .22 caliber long rifle with a "dot sight" and not a "scope," and was not a .223 with a scope, as reported by Jessen.  He stated that on the day of the incident, he was walking across the hayfield because the goats were on the southeast side of the field.  He testified that Jessen pulled up behind him on a tractor.  The defendant also stated in the interview that he had "no outstanding beef," with Jessen, like "thinking [Jessen] doesn't belong there.".  Kydney acknowledged that Jessen had a right to be there, and explained that Jessen was the

6

landlord and that Kydneys were renting from Jessen.  He apologized for scaring Jessen and stated he was just trying "to get the goats out of the field."  Kydney also stated that Jessen had seen him with a gun on previous occasions because he often target-practiced, since there was nothing else to do.

Agent Howard also testified that he requested a search warrant, specifying a search for an AR15 .223 with a scope.  Agent Howard stated that the defendant agreed to help Agent Howard execute the search and drove with Agent Howard from the casino to his house.   Agent Howard testified that during the drive, Sam Kydney made a statement to the effect, "this is just Jessen trying to get us back because we know he's tearing up or digging up an Indian burial ground."  The defendant participated in the search and helped locate the weapons.  Agent Howard found a weapon that matched Kydney's description of his gun, but no gun matching Jessen's description.  Agent Howard stated he never went to the site and viewed the topography as part of his investigation.  The defendant was arrested on the day the FBI executed the search warrant, and voluntarily came to the casino to be arrested.

At the close of the government's case, the defendant made an oral motion to dismiss both counts under Fed. R. Crim. P. 29.  In arguing in opposition to the motion to dismiss the terroristic threat count, the government stated that the evidence was sufficient to support a finding that the defendant acted in reckless disregard of the risk of causing terror.

The court sustained the defendant's motion for judgment of acquittal on the terroristic threat charge.  The trial proceeded with respect to the simple assault charge and that charge was submitted to the jury.  The jury returned a verdict of "not guilty" to

the charge of assault, after only ten or fifteen minutes of deliberation.  *See* Filing No. 34, Jury Verdict.

## II.  LAW

### A.  Jurisdiction

The court has jurisdiction over crimes committed in Indian Country under 18 U.S.C. §§ 1152, 7, and 13.  Title 18 U.S.C. § 1152, known as the Indian Country Crimes Act ("ICCA"), provides:  "Except as otherwise expressly provided by law, the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian Country."  18 U.S.C. § 1152;[1] *see United States v. Wadena*, 152 F.3d 831, 840 (8th Cir. 1998).  The federal criminal code defines most of the basic common law offenses, including assault.  *See, e.g.,* 18 U.S.C. § 113.  The Indian Major Crimes Act provides the federal courts with exclusive jurisdiction over certain enumerated crimes (murder; manslaughter; kidnapping; maiming; felonies and assaults involving minors; incest; assaults with intent to commit murder, with a dangerous weapon, or resulting in serious bodily injury; arson; burglary; robbery; and felony embezzlement) within Indian Country.  18 U.S.C. § 1153; *see Wadena*, 152 F.3d at 840.

The federal government can also prosecute Native Americans by utilizing state law where no comparable federal law exists under the Assimilative Crimes Act.  18 U.S.C. § 13; *United States v. Thunder Hawk*, 127 F.3d 705, 707 (8th Cir. 1997).  The

---

[1] The statute does not extend to "offenses committed by one Indian against the person or property of another Indian, nor to any Indian committing any offense in the Indian country who has been punished by the local law of the tribe, or to any case where, by treaty stipulations, the exclusive jurisdiction over such offenses is or may be secured to the Indian tribes respectively."  18 U.S.C. 1152.

ACA instructs federal courts to refer to state statutes for crimes committed on federal property to fill gaps in the federal criminal law that applies on federal enclaves. *See Lewis v. United States*, 523 U.S. 155, 160 (1998). The ACA will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior—where, for example, differences among elements of the crimes reflect jurisdictional, or other technical, considerations, or where differences amount only to those of name, definitional language, or punishment. *Id.* at 165. Where the state criminal law and the federal criminal law overlap, the federal definition of the crime shall be used. *See id.* at 169–73.[2]

### B.  Standards—Judgment of Acquittal

A district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a); *United States v. Jungers*, 702 F.3d 1066, 1068 (8th Cir. 2013); *United States v. Goodwin*, 719 F.3d 857, 860 (8th Cir. 2013). A motion for acquittal should be granted only if the court "conclude[s] that 'no reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *Jungers*, 702 F.3d at 1068 (quoting *United States v. Ward*, 686 F.3d 879, 882 (8th Cir.2012)). The district court must view the evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences from the evidence in favor of the government. *Jungers*, 702 F.3d at 1068. When a sufficiency argument hinges on the interpretation of

---

[2] In determining whether a state crime may be assimilated under the ACA, a court must first determine whether "the defendant's 'act or omission . . . [is] made punishable by any enactment of Congress.'" *Lewis*, 523 U.S. at 164. Ordinarily, if the answer is "no," the state statute may be assimilated. *Id.* If the answer is "yes," the court must then ask whether the applicable federal law indicates an intent to punish the relevant conduct to the exclusion of the state statute at issue. *Id.* at 164–65.

a statute, the district court's statutory interpretation is a question of law to be reviewed *de novo.*  *Id.* at 1069.

### C.  Count I—Nebraska Law

#### 1.  Neb. Rev. Stat. § 28-311.01

The elements of the crime of terroristic threats under Nebraska law are:  (1) the defendant threatened to commit a crime of violence; and (2) the defendant made the threat with the intent to terrorize, or acted in reckless disregard of the risk of causing such terror.  *State v. Schmailzl*, 502 N.W.2d 463, 466 (Neb. 1993).  The statute does not require that the recipient of a threat actually be terrorized nor does it require any intent to execute the threats.  *State v. Smith*, 678 N.W.2d 733, 736 (Neb. 2004) (hereinafter, "Smith II").

Intent is the state of mind operative at the time of an action and may be inferred from the words and acts of an accused and from the facts and circumstances surrounding the conduct.  *State v. Kipf*, 450 N.W.2d 397, 405 (Neb. 1990).  "In the context of a criminal statute, that which is done willfully or purposefully, rather than accidentally or involuntarily, is done intentionally."  *Id.*

To "terrify" is to fill with terror, to frighten greatly.  *Id.*  The intent to terrorize another is an intent to produce intense fear or anxiety in another.  *Smith II*, 678 N.W.2d at 736.  To "threaten" is to promise punishment, reprisal, or other distress.  *Kipf*, 450 N.W.2d at 405.  The term is characterized "in the criminal law to be a declaration of one's purpose to work injury to the person, property, or rights of another."  *Id.*  "[T]he term 'threaten' does not, in and of itself, necessarily import an unlawful act and must

10

therefore be restricted in its meaning in the light of the objective or purpose sought to be accomplished by the threats."  *Id.* at 405-06.

Intent to terrorize has been found in cases that involve threats to kill or harm the victim.  *See*, e.g., *State v. Van*, 688 N.W.2d 600, 621 (Neb. 2004) (verbal threat to take victim's life, gagging, blindfolding and shackling victim); ); *State v. Bottolfson*, 610 N.W.2d 378, 382 (Neb. 2000) (verbal threat to kill while pointing knife at distance of 3 feet); *State v. Willett*, 444 N.W.2d 672, 675 (Neb. 1989) (threat of murder); *State v. Thomas*, 798 N.W.2d 620, 623 (Neb. Ct. App. 2011) (threat of arson); *State v. Mukoma*, 2011 WL 2556933, *1 (Neb. Ct. App. June 21, 2011) (verbal threat to kill; *State v. Cortes-Lopez*, 789 N.W.2d 522, 524 (Neb. Ct. App. 2010) (verbal threats to kill while holding knife and poking in chest); *State v. Ajamu*, 2007 WL 461065, *2 (Neb. Ct. App. Feb. 13, 2007) (verbal threats to kill, striking and attempting to strangle victim); *State v. Bearden*, 2007 WL 1977242, *1 (Neb. Ct. App. July 10, 2007) (involving threat to kill, choking and history of domestic violence); *State v. Hernandez*, 2004 WL 1878200, *6 (Neb. Ct. App. 2004) (involving yelling and throwing objects at a vehicle, hitting and pulling occupants, putting a gun in passenger's mouth and firing shots while driving from scene); and *State v. Abbott,* 2002 WL 46848, *1 (Neb. Ct. App. June 15, 2002) (threat to kidnap, shoving and throwing victim).

A "crime of violence" is "an act which injures or abuses through the use of physical force and which subjects the actor to punishment by public authority." *State v. Rye*, 705 N.W.2d 236, 242 (Neb. Ct. App. 2005); *Abbott*, 2002 WL 46848 at *8 ; *State v. Palmer*, 399 N.W.2d 706, 717 (Neb. 1986).  "[R]obbery, murder, sexual assault, and assault with intent to inflict great bodily injury are crimes of violence." *Rye*, 705 N.W.2d

at 242; *see State v. Nelson*, 453 N.W.2d 454, 460 (Neb. 1990) (sexual assault); *Palmer*, 399 N.W.2d at 717 (robbery and murder); *State v. Foutch*, 244 N.W.2d 291, 292 (1976) (assault with intent to cause great bodily injury involving kicking a four-year-old child).

## 2. Neb. Rev. Stat. § 28-310

A person commits the offense of third degree assault if he: "(a) Intentionally, knowingly, or underlineecklessly causes bodily injury to another person; or (b) Threatens another in a menacing manner." Neb. Rev. Stat. § 28-310(1)(a) & (b) (emphasis added); [3] *see also* Neb. Rev. Stat. § 28-311(b) (classifying crime as either Class I or Class II misdemeanor); *State v. Goodon*, 361 N.W.2d 537, 539 (Neb. 1985). Under subpart (a), the statute does not require serious bodily injury, any bodily injury will suffice. *Id.* As used in the statute in subpart (b), the meaning of "menacing" commonly includes the showing of an intention to do harm. *Smith II*, 678 N.W.2d at 737.

Where no bodily injury is involved, the Nebraska third-degree assault statute "renders unlawful a promise to do another person bodily harm which is made in such a manner as to intentionally cause a reasonable person in the position of the one threatened to suffer apprehension of being so harmed." *Id.* Threats to kill, kidnap, shoot or stab, and commit arson constitute such "menacing manner" threats under Nebraska law. *See, e.g., Goodon*, 361 N.W.2d at 539-40 (threat to kill); *see also State*

---

[3] Nebraska criminalizes more serious assaults as follows: "A person commits the offense of assault in the first degree if he intentionally or knowingly causes serious bodily injury to another person." Neb. Rev. Stat. § 28-308(1); *see also* Neb. Rev. Stat. § 28-308(b) (classifying crime as a Class II felony). A person commits the offense of assault in the second degree if he or she intentionally or knowingly causes bodily injury to another person with a dangerous instrument; recklessly causes serious bodily injury to another person with a dangerous instrument; or unlawfully strikes or wounds another while legally confined, in custody, or as a sex offender. Neb. Rev. Stat. § 28-309(1)(a)-(c); *see also* Neb. Rev. Stat. § 309(2) (classifying crime as a Class III felony). Under Nebraska law, "the requisite intent [for first, second, and third degree assault] relates to the prohibited act, i.e., the assault, and not to the result achieved, i.e., the injury." *State v. Williams*, 503 N.W.2d 561, 563-64 (Neb. 1993) (stating that assault "is a general intent, not a specific intent, crime").

*v. Smith*, 2003 WL 22769284, *1 (Neb. Ct. App. Nov. 25, 2003) (hereinafter, "Smith I")(verbal threat to kill, chasing with butcher knife, stabbing knife through door, and pushing victim), *aff'd* 678 N.W.2d at 737 (*Smith II)*.

### 3. Double Jeopardy/Lesser Included Offense

Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or one is whether each provision requires proof of a fact which the other does not. *Blockburger v. United States,* 284 U.S. 299, 304 (1932).  The *Blockburger*, or "same elements," test asks whether each offense contains an element not contained in the other.  *State v. Winkler*, 663 N.W.2d 102, 107 (Neb. 2003).  If so, they are not the same offense and double jeopardy is not a bar to additional punishment or successive prosecution.  *Id.*

In applying the *Blockburger* test to criminal statutes that may be violated in alternative ways, only the elements charged should be compared in determining whether the offenses under consideration are separate or the same for purposes of double jeopardy.  *Id.* at 108 (noting that courts have always looked to the law the indictment claims the defendant violated; to apply *Blockburger,* a court must is look to the legal theory of the case or the elements of the specific criminal charge for which the defendant was convicted). "Under Nebraska's penal code, both third degree assault and terroristic threats are crimes that may be committed in alternate ways."  *Id.* at 107.

Nebraska courts have addressed the interplay of the terroristic threats statute and the third-degree-assault statute in the context of a double jeopardy challenge in several cases.  *See id.,* 663 N.W.2d at 107-08; *Smith II,* 678 N.W.2d at 737; *Gonzalez,* 2009 WL 2105706 at *3 (all involving Neb. Rev. Stat. § 28-310 and §311.01).  In *Smith*

*II*, the Nebraska Supreme Court found that third-degree assault (a misdemeanor) is not a lesser-included offense of terroristic threats (a felony). *Smith II,* 678 N.W.2d at 737. The Nebraska Supreme Court's focus in *Smith II* was the effect on the victim, not *mens rea. Id.* An intentional *mens rea* was involved with respect to both statutes. *Id.* at 736. A terroristic threat under § 28-311.01(a)requires an intent to terrorize, but "does not require the recipient of the threat be actually terrorized, and it does not require an intent to execute the threats made," whereas the "assault by threat" component of the simple assault statute, Neb. Rev. Stat. § 28-310(1)(b), is violated "when a person acts in a manner that intentionally causes a reasonable person in the position of the one threatened to feel apprehension of being bodily harmed." *Id.*

Importantly, in *Smith II*, only an allegation that subpart (a) of the terroristic threat statute ("with the intent to terrorize another")had been violated was at issue, not subpart (c) ("in reckless disregard of the risk of causing" terror).*See Smith I,* 2003 WL 22769284 at *3 (noting that "reckless" language had been stricken from the charging document). Similarly, in *Winkler*, the Nebraska Supreme Court compared the intentional threat subpart of the terroristic threat statute to the "resulting in bodily injury" component of the third-degree assault statute. *Winkler,* 663 N.W.2d at 108. *Similarly, Gonzalez* also involved an intentional terroristic threat under subpart (a) of § 3-311.01 and an intentional, or menacing "assault by threat" under § 28-310(1)(b). *Gonzalez,* 2009 WL 2105706 at *3. None of the cases involve a terroristic threat made recklessly and an assault that does not involve bodily injury, or mere threat.

*See, e.g., Smith II, 678 N.W.2d at 737; Smith I, 2003 WL 22769284 at  *2;* Winkler, 663 N.W.2d at 108; *Gonzalez,* 2009 WL 2105706 at *3.

14

### D.  Federal Law

Federal law prohibits several degrees of assault with varying levels of punishment.  18 U.S.C. § 113(a)(1)-(7); *see United States v. Chipps*, 410 F.3d 438, 448 (8th Cir. 2005).  Each of the seven subsections of § 113(a) sets forth the punishment available for a different type of assault—six of the subsections include facts that distinguish the particular assault type, such as "assault resulting in serious bodily injury," "assault with a dangerous weapon with intent to do bodily harm;" "assault by striking, beating, or wounding;" and "assault resulting in bodily injury"—and one describes the crime only as "simple assault."  18 U.S.C. § 113(a)(1)-(7); *see Chipps*, 410 F.3d at 448.

Absent contrary indications, Congress intends to adopt the common law definition of statutory terms.  *Chipps*, 410 F.3d at 448; *United States v. Yates*, 304 F.3d 818, 821-22 (8th Cir. 2002); *see United States v. Turley*, 352 U.S. 407, 411 (1957) ("[W]here a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning"); *United States v. Bell*, 505 F.2d 539, 540 (7th Cir. 1974) ("When a federal criminal statute uses a common law term without defining it, the term is given its common law meaning."); *United States v. Stewart*, 568 F.2d 501, 504 (6th Cir. 1978) (noting that the term "simple assault" in Section 113 is "no doubt intended to embrace the common law meaning of that term").  The federal simple assault statute merely prohibits "[s]imple assault" without specifying a particular kind of intent as a textual element of the offense.  18 U.S.C. § 113(a)(5); *see Bayes*, 210 F.3d at 69 (noting that "[u]nlike § 113(a)(1) of the statute, which criminalizes '[a]ssault with intent to commit murder,' and § 113(a)(3), which prohibits '[a]ssault with a dangerous weapon, with intent

to do bodily harm,' a specific kind of intent is not inherent in the statutory definition of the crime").

At common law, "assault" had two meanings:   "'the first being an attempt to commit a battery and the second [being] an act putting another in reasonable apprehension of bodily harm.'"   *United States v. Bayes*, 210 F.3d 64, 69 (1st Cir. 2000) (quoting *United States v. Bell*, 505 F.2d at 540); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) (stating that at common law, "assault" had two meanings— criminal assault, which is an attempt to commit a battery, and tortious assault, which is an act that puts another in reasonable apprehension of immediate bodily harm—"both are embraced within the term 'assault' as used in 18 U.S.C. § 113").   In order to obtain a conviction for simple assault under 18 U.S.C. § 113(a)(5), the government must show either:  (1) that the defendant attempted to commit a battery on the victim;[4] or (2) that the defendant put the victim in reasonable apprehension of immediate bodily harm.  *See Guilbert*, 692 F.2d at 1343; *Bell*, 505 F.2d at 540.

"Consistent with these principles, the common law provided that an assault committed by way of a battery did not require an intent to cause or to threaten an injury as long as the defendant touched another in a deliberately offensive manner without a valid reason to do so."  *Bayes*, 210 F.3d at 69; *see United States v. Lewellyn*, 481 F.3d 695, 698 (9th Cir. 2007) (simple assault under 18 U.S.C. § 113 includes "noninjurious but intentional, offensive contact (even if relatively minor)").  Under the second common

---

[4]A battery does not require proof of intent to injure or a threat of harm—"'[t]he slightest willful offensive touching of another constitutes a battery . . . regardless of whether the defendant harbor[ed] an intent to do physical harm.'"  *Bayes*, 210 F.3d at 68 (quoting *United States v. Williams*, 197 F.3d 1091, 1096 (11th Cir. 1999)); *see also Burton v. Livingston*, 791 F.2d 97, 99 (8th Cir. 1986) (noting that "a plaintiff may seek redress and win damages under state law for any unwanted touching under the common law of battery").

law meaning of assault, a conviction for simple assault requires an intentional act sufficient to cause reasonable apprehension. *See United States v. Acosta-Sierra*, 690 F.3d 1111, 1117-18 & n.2 (9th Cir. 2012) (noting that the second type of criminal assault is sometimes referred to as "intent to frighten" or "intentional scaring," as shorthand for causing reasonable apprehension of immediate bodily harm).

Simple assault under 18 U.S.C. § 113(a)(5) is not a "crime of violence." *See, e.g.*, *United States v. Diamond*, 463 Fed. App'x 608, 608-09 (9th Cir. 2011); *Ortega-Mendez v. Gonzales*, 450 F.3d 1010, 1017 (9th Cir. 2006) (stating that mere offensive touching is not categorically a crime of violence); *United States v. Ossana*, 638 F.3d 895, 901 (8th Cir. 2011)) (finding a conviction for aggravated assault under Arizona assault statute was a crime of violence because it required an actual "injury to another person," but a conviction under the subpart of the statute that prohibited "touching intended to provoke or insult another person," with a *mens rea* of recklessness would not qualify as a crime of violence).[5]  The United States Supreme Court has held that a qualifying crime used to enhance a sentence (e.g., violent felony) must demonstrate a defendant's propensity towards "purposeful, violent, and aggressive conduct." *Begay v.*

---

[5] These cases arise in the related context of sentencing where the U.S. Supreme Court has stated that courts must apply the "categorical approach" or "modified categorical approach" to determine whether a crime constitutes a crime of violence for purposes of applying a sentencing enhancement. *See United States v. Coleman*, 700 F.3d 329, 337-38  (8th Cir. 2012); *United States v. Forrest*, 611 F.3d 908, 909–10 (8th Cir. 2010); *see also Shepard v. United States*, 544 U.S. 13, 16 (2005).  Under the categorical approach, the court looks to the fact of conviction and the statutory definition of the prior offense and determines whether the full range of conduct encompassed by the state statute qualifies as a crime of violence to enhance the sentence. *Coleman*, 700 F.3d at 338.  Where the statute provides alternative sets of elements, one or more of which does not meet the criteria of a violent felony, courts "utilize the 'modified categorical approach' and examine 'the charging document, jury instructions, plea agreement or plea hearing transcript, and comparable judicial records.'" *Forrest*, 611 F.3d at 910; *Descamps v. United States*, 133 S. Ct. 2276, 2282 (June 20, 2013) (the "modified categorical approach" is authorized only when a prior conviction is for violating a so-called "divisible statute"—a statute that "sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building or an automobile.").  The modified categorical approach retains the categorical approach's central feature: a focus on the elements, rather than the facts, of a crime. *Descamps,* 133 S. Ct. at 2285.

*United States*, 553 U.S. 137, 144-45 (2008).   Indeed, the Eighth Circuit Court of Appeals could locate no "circuit-level cases post *Begay* in which a court found an offense qualified as a violent felony or crime of violence where the *mens rea* for the offense was mere recklessness and where there were no further qualifications to suggest purposeful, violent, or aggressive conduct." *Ossana*, 638 F.3d at 901.

III. DISCUSSION

The court finds that the evidence presented in the government's case-in-chief shows that the defendant is entitled to a judgment of acquittal on Count I of the Indictment.   Viewing the facts in the light most favorable to the government, no reasonable jury could find that the defendant made terroristic threats under Nebraska law.

The evidence showed only that the defendant, who had no history of any disagreement or feud with the alleged victim other than a vague discontent with treatment of Native Americans in general, fired shots in the victim's "general direction," momentarily shouldered his weapon, and pointed it toward the victim.  The court cannot glean an intent to terrorize from this evidence.  The court finds there is a failure of proof on the essential element that the defendant acted with intent to terrorize of Neb. Rev. Stat. § 28-311.01(1)(a).   The jury's eventual rejection of the assault charge, also requiring a finding of intent, reinforces this finding.

Absent evidence of intent to terrorize, the government's case admittedly rests on alleged "reckless disregard for the risk of causing such terror" under Neb. Rev. Stat. § 28-311.01(1)(c).  Under that subpart of the statute, the government must prove that the defendant threatened to commit a crime of violence in reckless disregard of the risk of

causing terror.   The court again finds proof of the essential elements of the case is lacking as a matter of law.

The government's reliance on Nebraska double jeopardy caselaw to support its theory is misplaced.   The issue is not whether the crimes of third degree assault and terroristic threats share the same elements, but whether a third degree assault based only on a threat can be the predicate threatened "crime of violence" for a terroristic threat made recklessly, not intentionally.   Essentially, the state-law felony charged by the government in Count I is recklessly threatening to commit a crime that involves only making a threat, in effect, threatening to threaten.

The problem with the government's theory lies in the fact that each of the statutes (terrorizing threats and third-degree assault) can be violated in alternative ways:   recklessly and intentionally.   To be actionable as criminal conduct under the third-degree assault statute, reckless assaultive behavior must result in bodily injury. Where, as here, no bodily injury is alleged, the assault—a threat to harm—must be intentional, recklessness will not suffice.   The court finds the government conflated the *mens rea* required for third-degree assault with the *mens rea* required to prove a terroristic threat.   Because it admittedly proved recklessness at most, the government failed to prove the elements of the terroristic threat crime.

Sam Kydney's purportedly assaultive conduct was shouldering a gun after shooting several times in Jessen's general vicinity.   The government argued that these actions were undertaken in reckless disregard of the risk of causing terror. Unfortunately, a *mens rea* of recklessness will not suffice to convert conduct that may amount to a misdemeanor to felony conduct under the circumstances of this case.   In

19

the context of the case—with evidence that the defendant commonly carried a gun and target practiced, evidence that he had been told to get goats off the property and had been instructed by his mother to shoot them, and no evidence of any previous confrontations, altercations, or arguments between the defendant and Jessen—there has been no showing of conduct that equates to making terrorizing threats under Nebraska law.

Nebraska cases do not hold to the contrary.  The court can find no case in which a simple assault without bodily injury is the threatened "crime of violence" that furnishes the predicate for criminal behavior under the terrorizing threat statute.  All of the cases involving prosecutions under both statutes are for conduct far more egregious than that shown herein.  None of the Nebraska cases involve a terrorizing threat to commit a threat under §28-310(1)(b) without something more than a mere threat.  The cases involve threats to kill, hurt, or maim, and most fact patterns show either an attempted battery, an actual physical battery, or a bodily injury.  All involve intentional, not reckless, conduct.

On these facts, no reasonable juror could find the defendant had a level of culpability beyond recklessness.  Fully credited, the evidence presented by the government's witnesses shows conduct that amounts to recklessness at most and may be closer to gross negligence.  That is not to say that the court, like Nebraska courts, cannot envision a circumstance where the threat of committing a misdemeanor would qualify  as a crime of violence under the terroristic threats statute.  This is not such a case, however.

Moreover, "assault by menacing threat" is generally not regarded as a crime of violence under either Nebraska law or federal law.   A "threat to threaten" a crime of violence is not an act that injures or abuses or that involves the use of physical force. The government did not charge that the defendant, by words or actions, threatened to kill, injure, or otherwise harm the victim or anyone else; it charged a threat to commit an assault, which absent any allegation of injury, is a mere threat.   Because both the threat charge and the crime on which it is based share the common element of a threat, the defendant's conduct is a step removed from the sort of conduct that would fit within the statutory definition of a terroristic threat.   A threat to threaten is not similar in kind or degree to a threat to commit murder, arson, burglary, robbery, or kidnaping.   Evidence of an intentional threat to commit any crime of violence is lacking in this case.

By virtue of its charging decision, the government attempts to convert a misdemeanor with an intentional *mens rea* to a felony that demands a lower level of culpability.[6]   The court finds it does not comport with logic, common sense, or due process to allow this result.[7]

Accordingly,

IT IS ORDERED that:

---

[6]   The action must be viewed through the lens of the court's limited jurisdiction over crimes that occur on the Reservation.   The alleged crimes were committed by a Native American against a non-native American in Indian Country, thus furnishing jurisdiction.   Because of the patchwork of laws in this area, the defendant's allegedly criminal conduct could be only be charged under federal law as a misdemeanor simple assault.   The government's novel attempt to convert the conduct to a state-law felony fails in this instance.

[7]   Even if the threatened crime of violence were simple assault under federal law, the same analysis would hold true.   The Nebraska third-degree assault crime is the statutory corollary to the common-law crime of simple assault.   Under both Nebraska and Federal law, simple assault is a misdemeanor and the elements are similar.

1.    The defendant's motion for a judgment of acquittal is granted with respect to Count I of the Indictment.

2.    Count I of the Indictment is dismissed.

3.    A Judgment in accordance with this Memorandum Opinion will be entered this date.

DATED this 5th day of September 2013.

BY THE COURT:


s/ Joseph F. Bataillon
United States District Judge